# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| UNITED STATES OF AMERICA | CRIMINAL ACTION |
|---|---|
| v. | NO. 19-452 |
| JAMIR FOUSHEE | |

### MEMORANDUM RE MOTION TO SUPPRESS EVIDENCE

Baylson, J.                                                                                                           November 10, 2020

## I. Introduction

The Motion to Suppress evidence presently before the Court arises from a routine traffic stop of a vehicle with tinted windows and a broken taillight. After weapons and drugs were discovered in the car, Defendant Jamir Foushee was indicted on multiple drug and weapons offenses. Foushee has filed a Motion to Suppress evidence found in his car, on his person, as well as his statements to police officers. For the reasons that follow, the Motion to Suppress will be denied.

## II. Procedural History

The Government filed an indictment in this matter on August 6, 2019. (ECF 1.) Defendant[1] was arraigned before Magistrate Judge Timothy P. Rice on August 19, 2019. (ECF 9.) At his arraignment, he pleaded not guilty. (Id.) On March 25, 2020, Defendant filed the Motion to Suppress currently under consideration. (ECF 19.) On March 27, 2020, the Government responded. (ECF 20.) An evidentiary hearing and oral argument took place on

---

[1] The original indictment identified Defendant as Jamir Young. The Government explained that Defendant had a criminal record under this name and they believed this to be correct. After defense counsel produced Defendant's birth certificate, the Government moved to amend the indictment to reflect the correct name (ECF 39), Jamir Foushee, and the motion was granted (ECF 41).

September 15, 2020. (ECF 36.) Following the hearing, Defendant and the Government each provided supplemental briefs. (ECF 40, 42.)

**III.     Record Evidence**

The following facts are gleaned from the hearing held on September 15, 2020 at which Officer Sulock[2] was the only witness. The Court found his testimony to be credible. (Hr'g Tr. 100:10–12, ECF 37.) On April 29, 2019, Officer Sulock and his partner, Officer Mooney, effectuated a routine traffic stop around 5:15pm in the Kensington neighborhood of Philadelphia based on the vehicle's tinted windows and broken taillight. (Id. at 10:6–11:3.) Officer Sulock observed two individuals in the vehicle, the driver and a passenger in the front seat. (Id. at 12:23–24.) After the officers activated their lights and sirens, Officer Sulock noticed the passenger "dipping down" in his seat for a "decent amount of time" which caused him to remark to Officer Mooney to "be careful." (Id. at 13:7–12, 36:11–12.) Officer Sulock explained that this movement concerned him for "safety reasons" stating: "that's happened numerous times where I've conducted vehicle investigations and recovered guns that way where people are reaching in certain areas or, you know, dipping down in a car in certain areas." (Id. at 14:8–12.)

Officer Mooney approached the vehicle on the driver's side and Officer Sulock approached the vehicle on the passenger's side. (Id. at 15:3–6.) It was later determined that the driver of the vehicle was Kendall Little aka Kendall Gourdain, and the passenger was Defendant Jamir Foushee. (Id. at 15:11–13, 14:18–19.) Officer Sulock spoke to Defendant and asked him what he doing. Defendant "was looking straight ahead," "would not make eye contact" with Officer Sulock," "his

---

[2] Officer Sulock has been an officer with the Philadelphia Police Department for approximately thirteen years. (Hr'g Tr. 8:18.) At the time of these events he was assigned to the Highway Patrol. (Id. at 9:16.)

2

hands were trembling," and "his chest was visibly rising up and down." (Id. at 15:22–25.) Upon request, Defendant produced identification. (Id. at 16:9–10.)

Officer Sulock stated that at this point he recognized Defendant's name and the picture on his driver's license. (Id. at 18:4–5.) He explained that another police officer, Officer Wildsmith, had shown him Defendant's photo about a month prior to these events because Defendant had fled the scene of a prior traffic stop. (Id. at 19:21–20:20, 21:23–22:3.)

After he handed over his identification, Defendant "picked a sandwich up that was sitting right to the left of him and he began eating the sandwich or trying to eat it and it was falling all over his legs, all over the floor of the vehicle." (Id. at 16:23–17:1.) Officer Sulock told Defendant that this behavior was making him nervous. (Id. at 17:4–6). Officer Sulock then explained to Defendant that he "was not being arrested" but because his behavior was making Officer Sulock nervous, he would "be detained." (Id. at 17:17–20.) Officer Sulock reached in through the open window, handcuffed Defendant, and asked him to step out of the vehicle. (Id. at 17:20–25.) At some point during the encounter, Officer Sulock requested that another police car join them, stating that he did not need assistance, just back up. (Id. at 49:22–23.)

Once Defendant was outside the car, Officer Sulock held onto Defendant by his waistband. (Id. at 51:24.) Then, Officer Sulock discovered a weapon in the car. During direct examination, the following exchange occurred:

> Q. What were you able to see, Officer, from outside the car when you were -- when you looked in?
>
> A. The handle of [a] black handgun.

(Id. at 23:5–7.) This testimony is not entirely consistent with Officer Sulock's testimony during cross examination, when the following exchange occurred:

3

> Q. Officer, when you say you saw the gun right away, what you mean is you saw the gun right away as soon as you started looking for it, right?
>
> A. Yes, I was looking. Correct.
>
> Q. This was not a weapon that was in plain sight, right?
>
> . . .
>
> Your Honor, if I -- like, when I was first talking to him the gun wasn't in plain view where I seen the gun. It -- I looked around the car to see it, but it was right -- it was tucked right under the seat.
>
> . . .
>
> Q. And in fact, Officer, you didn't see it until you actually ducked down and looked under the seat board, right?
>
> A. Correct.
>
> . . .
>
> It wasn't sitting right in plain view at the floorboard. It was underneath the seat but it wasn't tucked back far either. It was right -- it was underneath the seat but more towards the front of the seat, if that makes sense. But it was not in plain view where if I was looking from the outside I could see it out.

(Id. at 62:17–64:4.) Officer Sulock's answers on cross examination are consistent with his testimony at Defendant's preliminary hearing when he stated "[n]o, there was no gun in plain view, no." (Id. at 66:8–11.) The Court will find the testimony on cross-examination to be the most accurate recollection by the witness.

After Officer Sulock saw the gun under the front passenger seat, he walked Defendant back to the patrol car, and as he was placing him in the back of the vehicle, without prompting, Defendant told Officer Sulock that "the guns and the drugs were his." (Id. at 23:22–24.) Defendant repeated this statement multiple times as they were driving back to police headquarters.

4

(Id. at 24:21–25:8.)

In addition to the first gun, a full search of the car conducted at the scene of the stop recovered two more firearms and crack cocaine. (Id. at 25:16–25, 26:6–7.) This search revealed that both Defendant and Mr. Gourdain had cash on their person, and Defendant had additional crack cocaine. (Id. at 26:22–23, 27:12–16.) Defendant was charged with one count of being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g); one count of possession with intent to distribute crack cocaine, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C); and one count of possessing a firearm in furtherance of drug trafficking activity, in violation of 18 U.S.C. § 924(c)(1). (ECF 1.)

## IV. Legal Standard

"[U]nder the 'narrowly drawn authority' of Terry v. Ohio, 392 U.S. 1, 27 (1968), an officer without a warrant 'may, consistent with the Fourth Amendment, conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot.'" United States v. Robertson, 305 F.3d 164, 167 (3d Cir. 2002) (quoting Illinois v. Wardlow, 528 U.S. 119, 123 (2000)). The purpose of a Terry stop is "to permit a reasonable search for weapons for the protection of the police officer, where he has reason to believe that he is dealing with an armed and dangerous individual, regardless of whether he has probable cause to arrest the individual for a crime." Terry, 392 U.S. at 27. "If the lawful bounds marked by Terry are exceeded, any evidence obtained from the stop or the weapons search must be suppressed." Id. (quoting United States v. Johnson, 592 F.3d 442, 447 (3d Cir. 2010)).

In Michigan v. Long, the Supreme Court applied the concept of a Terry stop in the context of a limited search of a vehicle stating that

5

> the search of the passenger compartment of an automobile, limited to those areas in which a weapon may be placed or hidden, is permissible if the police officer possesses a reasonable belief based on "specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrant" the officer in believing that the suspect is dangerous and the suspect may gain immediate control of weapons.

463 U.S. 1032, 1049–50 (1983) (quoting Terry, 392 U.S. at 21). "It is also well settled that a police officer executing such a stop may exercise reasonable superintendence over the car and its passengers." United States v. Bonner, 363 F.3d 213, 216, (3d Cir. 2004). In Pennsylvania v. Mimms, the Supreme Court held that an officer may order a driver out of a vehicle without any particularized suspicion. 434 U.S. 106, 110–11 (1977). Maryland v. Wilson extended that rule to apply to passengers as well. 519 U.S. 408 (1997). Thus, ordering Defendant out of the car was permissible. The question remains whether Officer Sulock had reasonable suspicion to look underneath the passenger seat.

### a. Reasonable Suspicion

To meet the standard for reasonable suspicion, "an officer's reliance on a mere hunch is insufficient," however, "the likelihood of criminal activity need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard." United States v. Arvizu, 534 U.S. 266, 274 (2002). An officer "need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in his belief that his safety or that of others was in danger." Terry, 392 U.S. at 27. "To determine whether reasonable suspicion exists, we must consider the 'totality of the circumstances - the whole picture.'" Robertson, 305 F.3d at 167 (quoting United States v. Sokolow, 490 U.S. 1, 8 (1989)).

6

This analysis includes consideration of the officer's "knowledge, experience, and common sense judgment about human behavior." Id. As a result, officers may "make inferences from and deductions about the cumulative information available to them that might well elude an untrained person." Arvizu, 534 U.S. 26 at 273 (quotation and citation omitted). The Supreme Court has "accorded great deference to the officer's knowledge of the nature and the nuances of the type of criminal activity that he had observed in his experience, almost to the point of permitting it to be the focal point of the analysis." United States v. Nelson, 284 F.3d 472, 482, (3d Cir. 2002) (describing the Supreme Court's opinion in Arvizu).

"Finally, in determining whether the investigatory stop was legal, we examine its relative intrusiveness." United States v. Rickus, 737 F.2d 360, 366 (3d Cir. 1984) (citing Terry, 392 U.S. at 18 n.15). "Terry itself recognized that 'in determining whether the seizure and search were unreasonable our inquiry is a dual one - whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place.'" United States v. Goodrich, 450 F.3d 552, 558, n.6 (3d Cir. 2006).

### b. Nervousness

The Supreme Court has "recognized that nervous, evasive behavior is a pertinent factor in determining reasonable suspicion." Illinois v. Wardlow, 528 U.S. 119, 124 (2000). However, the Third Circuit has also stated that it will "resist the implicit invitation to elevate nervousness—or even an isolated evasive act—to the level that would allow police to detain anyone whom they conclude is nervous or trying to avoid them as they approach." United States v. Alvin, 701 F. App'x 151, 155 (3d Cir. 2017). Further, it is "not uncommon for most citizens—whether innocent or guilty—to exhibit signs of nervousness when confronted by a law enforcement officer." Id. at

156.

### c. Furtive Movements

"A suspect's furtive movements can contribute to an officer's reasonable suspicion that criminal activity is afoot." United States v. Harrison, No. 17-228, 2018 WL 4405892, *8 (E.D. Pa. Sept. 17, 2018) (collecting Third Circuit cases where furtive movements contributed to reasonable suspicion) (Schiller, J.). However, "not every slouch, crouch, or other supposedly furtive movement justifies a stop. This may be especially true in proverbial 'high-crime' areas, where residents may simply want to avoid encounters with police for reasons unrelated to any criminal conduct on their part." Alvin, 701 F. App'x at 155.

In United States v. Colen, the Third Circuit upheld the search of a car on very narrow grounds based on the defendant's furtive movements. 482 F. App'x 710 (3d Cir. 2012). When the police first approached the defendant's car, they noticed him "quickly shut the center console." Id. at 713. When asked, the defendant removed his license from his pants pocket, "thus negating a possible explanation for his gestures toward the center console." Id. When the officers returned to their car, they noticed him reach for the center console again. At that point, they removed him from the car, frisked him, and searched "the portion of the interior of the car that would have been within his immediate control when they allowed him to get back in." Id.

## V. Parties' Contentions

Because the September 15 hearing sharpened the factual and legal issues in the case, the Court's review of the parties' arguments will focus on the contentions appearing in their post-hearing briefing.

### a. Defendant's Supplemental Brief

Defendant first argues that by "piercing the air space" of the vehicle in order to look underneath the passenger seat, Officer Sulock conducted a search of the car within the meaning of the Fourth Amendment. (Def's Suppl. Br. 2–3, ECF 40.) Defendant argues that the information known to Officer Sulock at the time of the search did not constitute reasonable suspicion or probable cause. (Id. at 3–4.) Defendant also argues that the information provided to Officer Sulock by Officer Wildsmith should not be considered by this Court because it was not provided to defense counsel during discovery, defense counsel did not have the opportunity to investigate it, and the failure to mention this information in the police report implicates Officer Sulock's credibility. (Id. at 6–7.)

Regardless of whether the Court considers the testimony concerning Officer Wildsmith, Defendant argues that Officer Sulock did not have reasonable suspicion or probable cause to support a search of the car. Even if the information regarding flight from the police is considered, it is irrelevant to a finding that Defendant is armed and dangerous. (Id. at 7.) Defendant also argues that his alleged "dipping down" is "far more innocuous than the activity in many cases where the Third Circuit has upheld investigatory vehicle searches under Michigan v. Long." (Id. at 8.) Defendant emphasizes that he was compliant with all of Officer Sulock's commands, did not make any sudden or jerky movements, and that the officers were not responding to a crime. (Id. at 8–9.) Defendant also argues there are clear reasons for an individual to be nervous when pulled over by the police that do not implicate the officer's safety. (Id. at 9.)

### b. Government's Supplemental Brief

In response, the Government contends that "[i]t remains somewhat unclear whether Officer

9

Sulock's head was literally outside the vehicle when he first saw the handle of the gun, or whether he had poked his head slightly inside the open door of the car when he first saw the gun." (Government's Suppl. Br. 7, ECF 42.) Either way, the Government argues, Officer Sulock had reasonable suspicion to support his limited search of the car which led to his finding of the first firearm. (Id.) The Government puts forth the following circumstances in support of reasonable suspicion, (1) the Defendant was "riding in a heavily tinted car in a high crime area," (2) he "dipped down" in a furtive movement, (3) he exhibited "extraordinary nervousness," (4) and that Officer Sulock recognized him as someone who had previously fled a traffic stop. (Id. at 7–8.)

The Government characterizes the Defendant's position as "attempt[ing] to chip away at each factor comprising reasonable suspicion" which it argues is ineffective because the Court must consider the "totality of the circumstances." (Id. at 11.) With respect to the testimony regarding Officer Wildsmith, the Government argues that hearsay is admissible at a suppression hearing, and that the information was not offered for the truth of the matter asserted. (Id. at 12.) The Government also argues there is no discovery violation because "[n]ot everything to which someone will testify is in a report, and the government has no obligation to create discovery that does not otherwise exist." (Id.)

## VI.     Discussion

We start with acknowledging the broad latitude which the Supreme Court and the Third Circuit have given to police officers in car stops. Courts have recognized that vehicles are often used to provide concealment and mobility for individuals who possess firearms and/or drugs. See United States v. Mosley, 454 F.3d 249, 252 (3d Cir. 2006) ("When one peruses the traffic-stop suppression caselaw, one is struck by how rarely a traffic stop is found to have been illegal. In

United States v. Whren, 517 U.S. 806 (1996), the Supreme Court established a bright-line rule that any technical violation of a traffic code legitimizes a stop, even if the stop is merely pretext for an investigation of some other crime. And once a car has been legally stopped, the police may 'escalate' the encounter by visually inspecting the interior of the car, and checking credentials and asking questions of the occupants.").

The Court cannot ignore these precedents or the reality surrounding gun possession. The alleged circumstances supporting a finding of reasonable suspicion in this case are as follows: (1) that the stop occurred in a high-crime area, (2) Defendant's furtive movements as the officers pulled over the car, (3) Defendant's nervousness, and (4) the information from Officer Wildsmith provided to Officer Sulock that Defendant had previously fled from a traffic stop.

The Court will first consider the issue of the information provided by Officer Wildsmith. As the Court found Officer Sulock's testimony credible, it will assume that he was being truthful regarding the information provided to him. However, the Court also finds that this information is not relevant to determining whether reasonable suspicion existed. The knowledge that Defendant previously fled from another officer cannot justify this search when the purpose of the search is officer safety. The previous incident took place one month prior to the stop considered here and there is no suggestion that Defendant was suspected of having weapons at that time, or any other circumstances to suggest he was dangerous at that time. Further, during the stop considered here, Defendant was compliant with all of the officer's commands and did not attempt to flee at any point. Therefore, the fact that he fled from a stop in the past cannot suggest that he would be violent or possess a weapon one month later.

However, the remaining information known to Officer Sulock was sufficient for a finding

of reasonable suspicion.[3] While any of these factors alone may not be enough, considered together, Officer Sulock was warranted in checking whether Defendant may have placed a gun under the passenger seat as he was being pulled over. Based on his experience as a police officer, he noted Defendant's "dipping down" and warned his fellow officer about this movement. He explained that previous experience had taught him that this type of movement could mean a weapon was being hidden. Officer Sulock also noted that Defendant's nervousness went beyond what an officer might expect during a traffic stop to the extent that it made him nervous, a point he mentioned several times during his testimony.

Further, Officer Sulock conducted a quick, strictly limited search of the vehicle based on Defendant's observed movements in the car. Although Officer Sulock's testimony about where he first viewed the gun was not entirely consistent, the Court has found reasonable suspicion was present; therefore, it was permissible for him to briefly bend down to look under the front passenger seat, which was a minor search limited to the area where he had reason to believe a weapon might be located. Defendant's arguments that Officer Sulock violated the Fourth Amendment by "piercing the air space" of the vehicle are simply not supported by applicable

---

[3] The Court notes frequent accounts in various public media that vehicle stops are of particular concern to communities of color, and that minorities are more often subject to vehicle stops than white persons. See Samantha Melamed, Philly City Council bill aims to curb police stops of Black drivers for minor infractions, PHILADELPHIA INQUIRER (Oct. 28, 2020), https://www.inquirer.com/news/philadelphia-police-racial-bias-vehicle-stops-council-member-isaiah-thomas-black-drivers-20201028.html. At the same time, other media reports provide horrific accounts of the prevalence and consequences of gun possession by individuals who violate federal law by possessing firearms. See Mitch Blacher, Here's Where Illegal Guns Are in Philly, NBC10 (Feb. 8, 2020), https://www.nbcphiladelphia.com/investigators/illegal-guns-are-causing-havoc-in-philly-here-are-the-places-they-are-most-often-found/2289480/. However, given the Third Circuit and Supreme Court precedent on these issues, which this Court is of course bound to follow, the law allows for limited searches of vehicles based on justifiable suspicion, as occurred here.

precedents or any specific Third Circuit decision.

## VII.     Conclusion

For the reasons stated above, Defendant Jamir Foushee's Motion to Suppress Evidence will be denied.   An appropriate Order follows.

O:\Criminal Cases\19cr452 USA v. Foushee\19cr452 Memorandum re Motion to Suppress.docx